[S. F. No. 11630. In Bank.—December 24, 1926.]

AMELIA HERMINGHAUS et al., Respondents, v. SOUTHERN CALIFORNIA EDISON COMPANY (a Corporation) et al., Defendants; SOUTHERN CALIFORNIA EDISON COMPANY (a Corporation), Appellant.

[1] WATERS AND WATER RIGHTS—SEASONAL ACCRETIONS TO RIVER—CHARACTER OF.—Seasonal accretions to the waters of a natural stream which are variable in quantity in the course of each and every year, being largest at times of heavy rainfall in the watershed and also in the spring and summer by reason of melting snow in the mountains, which accretions are natural and regular, and occur in their usual expected and accustomed seasons, lasting through several months in the annual change of seasons of every year, constitute the usual and ordinary flow of the stream and are in no sense "storm," "flood," "vagrant," or "enemy" waters, as these terms are used in law.

[2] ID.—RIPARIAN OWNERS—RIGHT TO ACCRETIONS OF STREAM.—Owners of lands riparian to a river are entitled to their riparian rights in the entire flow of the waters of the river considering the same with its seasonal accretions as the usual and ordinary flow of the stream during each and every year.

[3] ID.—SLOUGHS—RIPARIAN RIGHTS.—Sloughs which take from a river at all stages and carry their water in well-defined channels, with banks and bottoms, to another slough, and other sloughs which take directly from the river at higher stages and likewise conduct their waters in similar channels to said slough, a distance of some miles, and other sloughs, having no mouths entering the river's banks, but taking water either by seepage from the main river or at times when the river overflows its adjoining banks, all of

---

1. See 25 Cal. Jur. 1109.
2. See 25 Cal. Jur. 1109.
3. See 25 Cal. Jur. 1083.

which sloughs conduct their waters in well-defined channels and which waters are never stationary but move in a current and have been doing so for many years, constitute legal watercourses; and the lands bordering on them are riparian lands which have a right to the flow of the water as it was, by nature, wont to flow, subject only to the reasonable use by riparian owners on the river at points above said lands.

[4] Id.—Connection of Sloughs With River.—The fact that sloughs make their connection with the main channel of a river at elevations which permit the waters thereof to enter the sloughs only when the increment in the water makes possible their passage, does not militate against their quality as watercourses.

[5] Id.—Riparian Owners—Rights in Stream—Nature and Extent of.—The rights of the riparian owners to the use of the waters of an abutting stream are paramount to the rights of any other persons thereto, and such rights are part and parcel of the land and any diminution of the stream against the will of the riparian owner by other persons is an actionable injury, an injury to the inheritance. The right to the flow of the water is inseparably annexed to the soil, and passes with it, not as an easement or appurtenant, but as a parcel. Use does not create, and disuse cannot destroy or suspend it. Each person through whose land a watercourse flows has (in common with those in like situation) an equal right to the benefit of it as it passes through his land, for all useful purposes to which it may be applied; and no appropriator of land on the same watercourse has a right *unreasonably* to divert it from flowing into his premises, or to obstruct it in passing from them, or to corrupt or destroy it. What is such reasonable use is a question of fact, and depends upon the circumstances appearing in each particular case.

[6] Id.—Use of Water—Artificial Contrivances to Diminish Use.—The fact that owners of riparian lands might by artificial contrivances, through dams, ditches, and reservoirs, involving large expenditures of money, so interrupt or regulate the present natural flow of the river as to render a smaller quantity of its waters sufficient to satisfy the beneficial uses which they are now making of such waters in their entirety, cannot operate to limit or lessen their riparian rights to the uses of the water in their natural course.

[7] Id.—Right to Underflow of Stream.—The rights of owners of agricultural land riparian to a river inhere not only in the upper flow of the waters which actually enters upon and permeates and fructifies the soil of the riparian lands, but also in the underflow of the river which lifts the upper flow thereof to the levels of entry upon such lands, and passes by to uplift the levels of lower

5. See 25 Cal. Jur. 1063, 1068; 27 R. C. L. 1071.
7. See 25 Cal. Jur. 1100.

riparian lands along the course of the river. The underflow of the stream is, with respect to riparian rights therein, no more waste waters than is the upper flow thereof which the riparian owner uses, since without the uplift of the former the outflow and beneficial use of the latter could not exist.

[8] ID.—USE OF WATER—DEVELOPMENT OF POWER.—An owner of lands riparian to a stream is entitled to use the water, in addition to the customary use for domestic purposes and for irrigation of riparian lands, for the purpose of development of power and electric energy; subject, however, to the duty imposed on all riparian owners and users of water to make a present return of such waters to the course of the stream without undue waste or diminution.

[9] ID.—UPPER RIPARIAN OWNERS—IMPOUNDING OF WATER FOR PRODUCTION OF POWER.—An upper riparian owner has no right to impound the waters of a river for the development of power and electric energy, where this would have the effect of causing a diversion of the waters which constitute the usual and ordinary flow of the river for periods and to an extent which would practically effectuate a withdrawal of said waters from a large portion of the lands of lower riparian owners during the period in each season when they are benefited by its flow and overflow.

[10] ID. — RIPARIAN RIGHTS — NATURE OF — COMMON LAW — PUBLIC POLICY.—By the adoption of the common law in 1850, riparian rights became vested; and riparian owners are entitled to have the stream flow past their land in its usual course, which right, so far as it is of regular occurrence and beneficial to their lands, is a right of property which neither a court nor the legislature can deprive the owner of upon the ground that the water may be more beneficially used by others.

[11] ID.—UPPER RIPARIAN OWNERS—TAKING OF WATERS FOR POWER PURPOSES—CONTRACT OF THIRD PERSONS.—The fact that upper riparian owners, seeking to impound the waters of a river by a system of reservoirs, have entered into a contract with one owner of riparian lands, restricting them to a certain limited reservoiring of the water, dependent upon the consent of their co-contractors, cannot affect the rights of other riparian owners, not parties to the contract, to have the unobstructed natural flow of the water.

[12] ID.—APPROPRIATION OF WATER—EFFECT OF.—It has long been settled in this state that an appropriation of water under the code divests no private existing right, but its effect is merely to give a preference over a subsequent appropriator or diverter who takes under no other right or title, and to fix the date of the posting of the notice as the inception of the claim under it.

8. See 25 Cal. Jur. 1123; 27 R. C. L. 1088.
10. See 25 Cal. Jur. 1012.
12. See 26 Cal. Jur. 45.

[13] ID.—SECTION 1419, CIVIL CODE—AMENDMENT OF 1911—CONSTRUCTION.—The amendment of 1911 to section 1410 of the Civil Code, with reference to the rights of appropriators of water, is not retroactive, and cannot operate to divest riparian rights already vested at the time it was enacted.

[14] ID.—WATER COMMISSION ACT OF 1913—CONSTRUCTION OF.—Waters of a river which have been for a period of more than ten consecutive years last past, and are being, applied to useful and beneficial purposes upon lands riparian thereto, are not the proper subject of appropriation under section 11 of the Water Commission Act of 1913 (Stats. 1913, p. 1012).

[15] ID.—DETERMINATION OF BENEFICIAL USE—POWER OF LEGISLATURE —WATER COMMISSION ACT—POLICE POWER.—The legislature has no right, under its police power, to determine what are the "useful and beneficial purposes" to which lands held in private ownership shall be devoted or the uses to which vested riparian rights which are an integral part thereof shall be limited, as declared in section 42 of the Water Commission Act.

[16] ID. — RIGHTS OF LESSEE OF FEDERAL GOVERNMENT — NAVIGABLE WATERS.—The right to sequester and store a large quantity of the water of a navigable river, for the development of power and electric energy, to the detriment of lower riparian owners, is not supported by a claim that it is done in aid of navigation as lessee of the United States government, which is the owner of certain lands on the upper reaches of the river and its tributaries, where the United States government has not transferred to the lessee any right or power to be exercised in aid of navigation and the plan contemplated the diversion of large quantities of the water for indefinite periods.

[17] ID.—ESTOPPEL—SUFFICIENCY OF EVIDENCE AND FINDINGS.—It is held in this action that the findings and conclusions of the trial court with reference to the plea of estoppel on the part of the plaintiffs to interfere with the appellant's alleged project and plans for the construction of its proposed system of reservoirs and storage plants sufficiently dealt with the matter and were sustained by the evidence.

(1) 40 Cyc., p. 555, n. 20. (2) 40 Cyc., p. 560, n. 47, p. 569, n. 26, p. 604, n. 22. (3) 40 Cyc., p. 554, n. 16, p. 560, n. 47. (4) 40 Cyc., p. 554, n. 16. (5) 40 Cyc., p. 561, n. 50, p. 562, n. 60, p. 563, n. 67, 68, 69, p. 566, n. 2. (6) 40 Cyc., p. 563, n. 65 New. (7) 40 Cyc., p. 565, n. 94. (8) 40 Cyc., p. 564, n. 87, p. 565, n. 89, 91, 94. (9) 40 Cyc., p. 565, n. 91, p. 568, n. 26. (10) 40 Cyc., p. 557, n. 30, p. 558, n. 33. (11) 40 Cyc., p. 565, n. 91. (12) 40 Cyc., p. 708, n. 36. (13) 40 Cyc., p. 708, n. 36. (14) 40 Cyc., p. 704, n. 10. (15) 40 Cyc., p. 705, n. 15. (16) 40 Cyc., p. 606, n. 35 New. (17) 21 C. J., p. 1252, n. 93.

APPEAL from a judgment of the Superior Court of Fresno County. J. E. Woolley, Judge. Affirmed.

The facts are stated in the opinion of the court.

Edward F. Treadwell, Roy V. Reppy, George E. Trowbridge, Gail C. Larkin and Lindsay & Conley for Appellant.

John W. Preston, James F. Peck, Preston & Duncan, Annette Abbott Adams and Robert E. Hatch for Respondents.

McCutchen, Olney, Mannon & Greene, Warren Olney, Jr., Lucien Shaw, John G. Sargent, Attorney-General of the United States, Howard Baxter and James F. Lawson, Special Assistants to the Attorney-General of the United States, *Amici Curiae* in support of Appellants.

George J. Hatfield and Fred B. Wood for James J. Stevinson (a Corporation), Chickering & Gregory for Sierra & San Francisco Power Co. (a Corporation), Sloss & Ackerman and Samuel C. Wiel, *Amici Curiae* in support of Respondents.

U. S. Webb, Attorney-General, and Spencer Burroughs, for the State of California et al.; Richard J. Coffey, for the United States Bureau of Reclamation; A. E. Chandler, A. L. Cowell, P. H. Griffin, H. J. Hankins and M. B. Harris, for Irrigation District Association of California; Power & Mc-Fadzean, for Alto Irrigation District; Harris, Johnson, Willey & Griffith, for Consolidated Irrigation District, Madera Irrigation District, and Stratford Irrigation District; Harris & Hayhurst and Harris, Johnson, Willey & Griffith, for Fresno Irrigation District; A. E. Chandler, for Corcoran Irrigation District; Hankins & Hankins, for Glenn-Colusa Irrigation District; Guy Knupp, for Foothills Irrigation District; H. C. Bell, for Jacinto Irrigation District and Princeton-Codora-Glenn Irrigation District; J. E. Rodgers and A. F. Bray, for Knightsen Irrigation District, A. L. Cowell, for Merced Irrigation District; C. F. Metteer, for Nevada Irrigation District; P. H. Griffin, for Oakdale Irrigation District and Turlock Irrigation District; Griffen, Boone & Boone, for Owens Valley Irrigation District; Edw.

T. Houghton for Lemoore Irrigation District; George R. Freeman for Provident Irrigation District; Nutter, Hancock & Rutherford for South San Joaquin Irrigation District; Sidney J. W. Sharp for Laguna Irrigation District, Riverdale Irrigation District, Liberty Mill Race Company, Reed Ditch Company, and Liberty Canal Company; Charles L. Childers for Imperial Irrigation District; H. Scott Jacobs for Last Chance Water Ditch Company, People's Ditch Company, and Lucerne Irrigation District; F. E. Borton for Kern River Water Storage District; L. J. Maddux for Modesto Irrigation District; D. E. Perkins for Alpaugh Irrigation District; Raymond A. Leonard for Oroville-Wyandotte Irrigation District, Thermalito Irrigation District, Paradise Irrigation District, and Table Mountain Irrigation District; Warner Lee Pierson for La Canada Irrigation District; W. D. Tillotson for Fall River Valley Irrigation District; W. R. Bailey for Tulare Irrigation District and Various Mutual Water Companies, *Amici Curiae* in support of Appellants in Part and in support of Respondents in Part.

RICHARDS, J.—This appeal is from a judgment in the plaintiffs' favor in an action brought by them to obtain an injunction preventing the defendants from an alleged actual and proposed diversion of the waters of the upper San Joaquin River and its tributaries to the irreparable injury of the plaintiffs through the interference thereby with riparian rights of the latter in and to the flow and use of the waters of said river upon, along, and across their lower lying lands contiguous to the banks and course of said river. The plaintiffs in their original complaint herein allege that they are the owners and tenants in possession of a certain large tract of land containing about 18,000 acres in the counties of Fresno and Madera, state of California, and extending along the bank of the main channel of the San Joaquin River for a distance of about twenty miles, the said land being as to the whole thereof riparian to said river and the said plaintiffs having, for many past years, in the exercise of their riparian rights therein, made appropriate use of the waters of said river for the irrigation, overflow, and enrichment of their said lands and of the whole thereof. The plaintiffs proceed to allege that the defendants, being the occupants of

lands lying along the reaches of the San Joaquin River and its tributaries above to the location of the plaintiffs' lands, claim some right in and to the waters of said river and to the use thereof adversely to the rights of the plaintiffs therein and by virtue of such claims are threatening by dams, reservoirs, and other works to stop the flow of said river and to impound the waters thereof in and thereby to divert the waters of said river impounded and to convey the same away from said river at points above the plaintiffs' said lands so as to prevent the waters of said river from flowing through the courses and channels thereof down to and along, across, and over the said lands of plaintiffs, and to thus deprive the latter of the use and enjoyment thereof to their great and irreparable injury. The fuller particulars of the plaintiffs' utilization of the waters of said river and of the nature of the defendants' actual and threatened interference with such uses as alleged in said complaint will be set forth at a later point in this opinion. To the plaintiffs' complaint the defendants presented their answer, wherein and in certain amendments thereto they proceeded by denials and by affirmative averments to set forth twelve separate defenses to the plaintiffs' alleged cause of action. The particulars of these will also be adverted to in their proper order in the course of this decision. It is sufficient here to state that the said defendants by their said answer and defenses put in issue the averments of the plaintiffs' complaint respecting the nature of the rise and flow of the waters of said river as related to the plaintiffs' asserted right to the use thereof as lower riparian owners along the banks and courses thereof, and also put in issue the question as to the fullness and extent to which the plaintiffs' said lands, or certain portions thereof, are riparian to said stream. To these two primary considerations the trial court addressed itself in its findings of fact and in its conclusions of law based thereon; and it would seem that these should be the first to receive our consideration before passing to the other questions discussed upon this appeal and which must necessarily be to a greater or less degree predicated thereon.

The trial court found upon sufficient evidence, which was not materially conflicting, that the San Joaquin River was a natural stream of water with well-defined channels and banks

which, with its tributaries, took its rise in the Sierra Nevada Mountains and descended thence in a general westerly course to the plains of the San Joaquin Valley, and thence in a general northwesterly direction through the counties of Madera, Fresno, Merced, Stanislaus, and San Joaquin to the San Francisco Bay; that the said river in its usual, ordinary, and natural flow passed along and over the lands of the plaintiffs herein; that the natural flow of water in the said San Joaquin River is, and has always been and always will be, if unobstructed, variable in quantity in the course of each and every year; that is to say, the same is, has been, and will be largest and most abundant at times of heavy rainfall over its watershed in said mountains in each winter season, and will also have a larger accretion in the spring and summer season by reason of the melting of the snows in said mountains; that these annually occurring accretions in the amount and flow of the waters of said river are natural and regular, and occur in their usual, expected, and accustomed seasons and result in an increased amount and flow of the waters of said river as they proceed by, along, and across the lands of said plaintiffs, lasting through several months in the annual change of seasons of every year. From these findings of fact based upon evidence which is indisputable the conclusion is inevitable that the waters of the San Joaquin River annually flowing therein before and during and after these regularly occurring accretions in the volume thereof constitute the usual and ordinary flow of said river and are in no sense "storm" or "flood" or "vagrant" or "enemy" waters as these terms are understood in law. This has in fact been so definitely determined by the decisions of this and other courts having precise reference to the waters of this and of other similar streams taking their sources in the same range of mountains and owing their periodical accretions to the same general causes, as to be no longer a matter susceptible of serious dispute. In the case of *Miller & Lux* v. *Madera Canal etc. Co.,* 155 Cal. 59 [22 L. R. A. (N. S.) 391, 99 Pac. 502], this court was called upon to determine the nature of the annual flow of the waters of the Fresno and also of the San Joaquin Rivers, which streams take their rise in the same general region and are subject to the same periodic and climatic conditions. It was in that case contended by the defendant that the waters it proposed to divert did not

constitute any part of the ordinary or usual flow of these rivers, but were waters occurring during periods of heavy rains and were storm, freshet, and flood waters as distinguished from the ordinary and usual flow of said rivers, and that as such the defendant was entitled to impound, divert, and use the same.  On the other hand, it was claimed by the plaintiff that the rise in the flow of the waters in said rivers was not extraordinary, occurring upon rare occasions, but that such flow and overflow occurred in all years of ordinary rain and snowfall and constituted the regular annual and usual flow of said rivers.  The trial court found in that case, as in this case, that the claim of the plaintiff relative to such waters was correct, and this court in sustaining such finding and conclusion used the following language:

"Upon this showing it cannot be said that a flow of water, occurring as these waters are shown to occur, constitutes an extraordinary and unusual flow.  In fact, their occurrence is usual and ordinary.  It appears that they occur practically every year and are reasonably expected to do so, and an extraordinary condition of the seasons is presented when they do not occur; they are practically of annual occurrence and last for several months.  They are not waters gathered into the stream as the result of occasional and unusual freshets, but are waters which on account of climatic conditions prevailing in the region where the Fresno River has its source are usually expected to occur, do occur, and only fail to do so when ordinary climatic conditions are extraordinary— when a season of drouth prevails."

Again, the court says:

"This is the character of the waters of the Fresno River, the flow of which it is shown the defendant intends to divert.  These overflow waters, occasioned through such usually recurring floods and freshets, are not waters which flow beyond the natural channel boundaries of the stream which nature has designed to confine their flow; they are not waters which depart from the stream or are lost or wasted; they flow in a well-defined channel in a continuous body and in a definite course to the San Joaquin River, and while they spread over the bottom lands, or low places bordering on the main channel of the Fresno River as it carries its stream during the dry season, still this is the usual, ordi-

nary, and natural channel in which they flow at all periods of overflow, the waters receding to the main channel as the overflow ceases."

And finally the court concluded:

"In the present case the storm and freshet waters are not something distinct and separate from the ordinary waters of the Fresno River. As a fact, and under the authorities, being annually recurring floods and freshets flowing in a clearly defined channel, they constitute a part of the ordinary flow of the waters of such river."

[1] In the case of *Piper* v. *Hawley*, 179 Cal. 10, 17 [175 Pac. 417], this court expressly approved the doctrine laid down in the foregoing case to the effect that annually recurring floods, even though the flow of their waters made the stream wider during the period thereof so as to include adjoining lands, are yet to be deemed a part of the ordinary flow of the stream. In the case of *California Pastoral etc. Co.* v. *Enterprise C. & C. Co.*, 127 Fed. 741, the circuit court of the United States, sitting in and for the southern district of California, and having under consideration a case wherein the particular lands affected by the present controversy and the riparian rights of the owners and occupants thereof in relation to the San Joaquin River were involved, decided that the waters of the San Joaquin River which the defendant in that case was proposing by means of a canal and dam to divert from their accustomed flow in said river along and over the Herminghaus lands were not storm or freshet waters which any person who can may impound and use, but that such waters constituted the usual and ordinary flow of said river in which the full riparian rights of the owners of said lands inhered. In the case of *Lindblom* v. *Round Valley Water Co.*, 178 Cal. 450 [173 Pac. 994], this court said with relation to the facts of said case: "The evidence is clear to the effect that the water running into Round Valley (and, except as interrupted by the defendant down North Canyon) consisted of the runoff from the usual and annually recurring fall of rain and snow. Such water, when running in a defined stream, constitutes a watercourse to which the riparian proprietor's rights attach." (Citing *Miller & Lux* v. *Madera etc. Co., supra*.)

[2] In the presence of the foregoing consistent rulings of this court and of the federal court having reference to the precise or similar conditions relative to the annual, usual, ordinary, and regularly recurring outflow of the San Joaquin River during the varying seasons of each and every year we are constrained to hold that in so far as the lands of said plaintiffs shall be found to be riparian to said river they are entitled to the exercise and enjoyment of whatever riparian rights they shall be determined to be invested with, in the entire flow of the waters of said river considering the same with its seasonal accretions as the usual and ordinary flow of said stream during each and every year.

[3] The next question to which our consideration should logically be directed is as to what are the riparian rights of the plaintiffs in respect to said river and the waters thereof. This question is divisible into several parts, the first of which involves the inquiry as to how much of the plaintiffs' said tract of land is riparian to the San Joaquin River. The findings of the trial court germane to this inquiry show that the plaintiffs' large tract of land lies in a position of peculiar and unique vantage in its relation to the San Joaquin River, since said tract of land not only extends for a goodly number of miles along the bank of the main channel of said river, but also lies just at the base of the lower reaches of the Sierra Nevada Mountains, from which the river makes its immediate debouchment into the plain, and in the apparent stress of which it has cut numerous minor channels or sloughs, so called, twenty-two in number, which parallel or intersect each other and which extend into and in some instances across the plaintiffs' tract of land and which convey the waters of said river which enter the same at different seasons of the year out upon or over said lands and finally conduct the residue of such waters back into the main channel of the river. Upon this subject the findings of the trial court are, we think, fully sustained by the evidence and are quite lengthy and detailed but are also very instructive. The opinion of the trial court rendered in deciding this cause makes the following summary of these detailed findings which will suffice for the purposes of this decision: "The evidence in this case shows that some of the sloughs that traverse the Herminghaus property, such as sloughs 19, 20 and 22, take from the river at all stages and carry their

water in well-defined channels, with banks and bottoms, to Fresno Slough. Others of the sloughs, such as number 1 and number 9, take directly from the river at higher stages and likewise conduct their water in similar channels across the Herminghaus property to Fresno Slough, a distance of some miles. Others of the main sloughs have no mouths entering the river's banks, but take water either by seepage from the main river or at times when the river overflows its adjoining banks. After the water has entered these sloughs, they conduct the same in well-defined channels across the Herminghaus property to Fresno Slough. The testimony showed that the water in these sloughs was not stationary but was moving in a current. The evidence also showed that these sloughs, or at least the ones the descriptions of which have heretofore been set forth, carry water as above set forth each year during the late spring and summer months when the San Joaquin River has been raised by waters from the melting snow. The testimony also showed that these sloughs for many years have been conducting water in this manner. It appears to me, therefore, that there is every element here that goes to make up a legal watercourse. These sloughs have definite beginnings, definite channels with banks and bottoms and a definite ending in Fresno Slough. Likewise, there is a permanent source from which they take water during certain seasons of the year. I am forced to the conclusion, therefore, that these sloughs, are in fact, and in law, watercourses, and that the lands bordering on them are riparian lands, and have a right to the flow of the water as it was, by nature, wont to flow, subject only to a reasonable use by riparian owners on the San Joaquin River, at points above said lands.'' With the foregoing conclusions of the trial court with reference to the nature of these twenty-two channels or sloughs as watercourses conveying the waters of the said river to practically all the lands of these plaintiffs, thus rendering the same and the whole thereof riparian to the San Joaquin River, we entirely agree. [4] The fact that some of these sloughs make their more or less definite connection with the main channel of said river at elevations which permit the waters thereof to enter said sloughs only when the increment in the *quantum* of such waters reaches a height and volume which makes possible their passage into the same, in no way mili-

tates against their quality or utility to the plaintiffs as watercourses since the plaintiffs are, as we have seen, entitled to the beneficial use of said waters in some degree at least at all times and under all conditions attending the usual and ordinary flow of said stream.

This conclusion leads us to our next consideration, which involves the nature, extent, and limitations of the plaintiffs' riparian rights in and to the use of the waters of the San Joaquin River in connection with their ownership and uses of their said tract of land. We shall first consider this subject abstractly and without reference to the bearing upon it of those rights which the defendants possess as upper proprietors upon the San Joaquin River. The plaintiffs in their complaint aver that for more than ten years prior to the commencement of this action they were and have since been the owners in fee of the 18,000 acres of land described in their said complaint located in the San Joaquin Valley and bordering on the San Joaquin River; that the climate of that portion of the San Joaquin Valley is arid and as a result thereof their said land, unless irrigated, is unfit for cultivation or the growing of profitable crops thereon; that the soil is naturally fertile and very productive if water is supplied thereto; that the natural flow of the waters of the San Joaquin River is variable in quantity, being more abundant during the period of rainfall in the winter season and also during the late spring and summer when the snows upon its watershed in the high Sierras melt and contribute their accretion to said river; that during these periods in the augmented natural flow of said river the waters thereof flowed naturally out and over the plaintiffs' said lands and saturated the same and deposited thereon a very fertile silt which enriched said land and caused an abundant growth of grasses thereon as the same would not have grown except for said natural irrigation by the overflow of said waters and the deposit of said silt; that said waters reached said land as to the lower portions thereof, which are described as swamp and overflow land lying immediately adjacent to the lower reaches of said river, by direct overflow therefrom, but that said waters reached the upper portions of said tract of land during said periods of abundant flow by means of the numerous sloughs or channels which have been hereinbefore referred to; that as the quantity of water flowing in said

river diminishes, the area of said lands covered by the flow of said river in its higher stages would diminish until such waters would be confined to the said channels which traverse said lands and would then seep into and moisten the same while such waters continued to flow in said restricted channels; that any artificial change in the natural 'flow of the waters of said river which would cause a further diminution in the *quantum* of the flow thereof would result, to the extent of such diminution, in the cessation of the accustomed overflow' of the river directly and through the aforesaid numerous channels thereof and would, if sufficiently extended, cause the waters of said river to proportionately cease to enter said sloughs or channels or to continue to flow therein and would thereby diminish the area of said lands thus irrigated and enriched and render the same, to the extent of such deprivation, arid and unsuitable for the growth of grasses or other products thereon and thus destroy the value and profitable use of the same.  The answer of said defendants put in issue the aforesaid averments of the plaintiffs' complaint in those portions of its several defenses wherein they controvert the plaintiffs' claim that those parts of the plaintiffs' said lands which are traversed by the aforesaid channels and sloughs other than the main channel of said river, or are affected by the overflow from the former, are areas of said lands which are riparian to said river; or that the waters of said river which enter the same during periods of its most abundant flow constitute the usual and ordinary flow of said river; or that plaintiffs are entitled thereto as riparian proprietors along the course of said river; or, if so, to the extent and nature of the uses and benefits to which the said plaintiffs claim the right as such riparian proprietors to put and continue to utilize said waters.  The trial court upon the particular issues thus joined found the aforesaid averments of the plaintiffs' complaint to be true. [5] We are satisfied from a careful review of the evidence in this case that it sufficiently sustains the findings of the trial court in the foregoing regard; and this being so it becomes necessary for us at this point to review the history and development of the law of riparian rights in this state. We are saved the necessity of an extended elaboration of the earlier stages of that development by the decision of this court in the leading case of *Lux* v. *Huggin,* 69 Cal. 255 [4 Pac. 919,

10 Pac. 674], wherein, in the longest opinion in the judicial history of this court, the growth and development of the doctrine of riparian rights under the common law, in other jurisdictions, and finally in California since its adoption of the common law in the year 1850, through a course of judicial decision down to the date of the determination of that cause upon appeal, is exhaustively reviewed. While it is true that the decision in the case of *Lux* v. *Haggin* was that of a divided court, we think it is also true, as stated by Mr. Chief Justice Shaw in his most able review of the "Development of the Law of Waters in the West," to be found in the appendix to 189 Cal., at page 779 et seq., that "It declared that the rights of the riparian owners to the use of the waters of the abutting stream were paramount to the rights of any other persons thereto; that such rights were parcel of the land and that any diminution of the stream against the will of the riparian owner by other persons was an actionable injury. The question was settled by that case and the riparian right has never since been disputed." When we turn to that notable decision to determine just what was thus settled in the way of a definition of the riparian right we find that it is embraced in the following conclusions by Chief Justice Shaw of Massachusetts in the case of *Johnson* v. *Jordan*, 2 Met. 239 [37 Am. Dec. 85], which this court therein adopted and approved in the following language (page 391) : "The right to the flow of water *is inseparably annexed to the soil,* and passes with it, not as an easement or appurtenant, *but as a parcel.* Use does not create, and disuse cannot destroy or suspend it. Each person through whose land a watercourse flows has (in common with those in like situation) an equal right to the benefit of it as it passes through his land, for all useful purposes to which it may be applied; and no proprietor of land on the same watercourse has a right *unreasonably* to divert it from flowing into his premises, or to obstruct it in passing from them, or to corrupt or destroy it." In a later portion of the opinion this court said (page 394) : "By our law the riparian proprietors are entitled to a reasonable use of the waters of the stream for the purpose of irrigation. What is such reasonable use is a question of fact, and depends upon the circumstances appearing in each particular case." The doctrine of riparian rights thus abstractly stated has

been clarified, though not materially changed, by this court in its application to the particular cases which have come before it since the decision of the case of *Lux* v. *Haggin, supra.* The case of *Heilbron* v. *Last Chance Water Ditch Co.,* 75 Cal. 117 [17 Pac. 65], was one wherein the tenant in possession of a large tract of land riparian to Kings River brought suit to restrain a diversion of the waters of said river by an upper appropriator who had diverted a large body of the waters of such river and conveyed the same by a ditch to land not riparian to said river. In setting forth the original right of the plaintiff to have said stream continue to flow as by nature it was wont to flow over, through, or along his land, this court said: "It seems clear, upon principle and authority, that the diversion of natural water from land is 'an injury done to the inheritance.' The flow of natural water over land is a continuous source of fertility and benefit; and its withdrawal is followed by consequences which are perpetually injurious to the freehold. This is strikingly illustrated by the averments in the complaint in this case, 'that the waters of said Kings River have hitherto been accustomed to overflow, seep through, and moisten the lands of said rancho, whereby the fertility of said lands was greatly increased, and a large and valuable quantity of natural grass was produced upon said lands'; and that, by reason of the diversion of the water by defendant, 'said lands have failed to produce their accustomed crops of natural grass.' The flow of the water of a stream, whether it overflows the banks or not, naturally irrigates and moistens the ground to a great and unknown extent, and thus stimulates vegetation; and the growth and decay of vegetation add, not only to the fertility, but to the very *substance and quantity* of the soil. It is not true, therefore, as claimed by appellants, that the water of a natural stream may be taken away from land for a great number of years, and then turned back, without any permanent injury to the land." In the case of *Southern California Investment Co.* v. *Wilshire,* 144 Cal. 68 [77 Pac. 767], wherein the controversy was between the plaintiff as a lower and the defendant as an upper riparian proprietor along a certain stream, this court said: "The plaintiff has riparian rights in the stream, and this right extends to all the water flowing

in the stream through its lands, . . . As such riparian owner, it has the right to have the stream continue to flow through its lands in the accustomed manner, and to use the same to irrigate an additional area thereof, undiminished by any additional or more injurious use or diversion of the water upon the stream above. This right is a part of the estate of the plaintiff—parcel of its land,—and whether it is or is not as valuable in a monetary point of view, or as beneficial to the community in general, as would be the use of a like quantity of water in some other place, it cannot be taken by the defendants without right, or, in case of a public use elsewhere, without compensation. It is not necessary in such cases for the plaintiff to show damages, in order that it may be entitled to a judgment. It is enough if it appears that the continuance of the acts of the defendants will deprive it of a right of property, a valuable part of its estate.'' (Citing cases.) In the case of *Anaheim Water Co.* v. *Fuller*, 150 Cal. 327 [11 L. R. A. (N. S.) 1062, 88 Pac. 978], wherein the plaintiffs, who were lower riparian owners along the Santa Ana River, sought to enjoin the defendants, who were upper riparian owners upon said river, from diverting water from the stream by means of a ditch through which said defendants proposed to convey such water to other lands not riparian to the stream, the defendants, among other contentions, urged that the plaintiffs were actually using but 400 inches of water for their land, and that there would remain in the stream after the defendants' proposed diversion more than 2,000 inches flowing down to and beyond the plaintiffs' lands and which was more than the latter could possibly use thereon, and that, therefore, no damage could ever ensue, even conceding the defendants' diversion to be unlawful, and hence that their said diversion ought not to be enjoined. Mr. Justice Shaw, in dealing with this contention, said (page 335): ''The theory of the law of riparian rights in this state is that the water of a stream belongs by a sort of common right to the several riparian owners along the stream, each being entitled to sever his share for use on his riparian land. The fact that a large quantity of water flows down the stream by and beyond the plaintiffs' land does not prove that it goes to waste, nor that the plaintiffs are entitled to take a part of it, as against other riparian owners or users below. Nor can it be said that plaintiffs,

on account of the present abundance, could safely permit defendants to acquire, as against them, a right to a part of the water. The riparian right is not lost by disuse, and other riparian owners above may take, or others below may be entitled to take, and may insist upon being allowed to take all of the stream, excepting only sufficient for the plaintiffs' land. In either alternative, the taking of a part of the water by the defendants would not leave enough for the plaintiffs' use. There is nothing in this case to show how much water is required above and below by those having rights in the stream. In view of the well-known aridity of the climate and the high state of cultivation in the vicinity, the court could almost take judicial notice that in years of ordinary rainfall there is no surplus of water in the stream over that used by the various owners under claim of right. But, however this may be, it is settled by the decisions above cited that a party, situated as the plaintiffs are, can enjoin an unlawful diversion, in order to protect and preserve his riparian right." In the case of *Modoc L. & L. S. Co.* v. *Booth,* 102 Cal. 151 [36 Pac. 431], the plaintiffs, who were the owners of swamp and overflowed land riparian to the Pitt River, sought an injunction to prevent the defendants, who were upper but nonriparian owners of land, from appropriating 200 inches of water from said river for irrigation, stock, and domestic uses upon their nonriparian lands. The evidence in the case showed that the plaintiffs were engaged in reclaiming their said swamp and overflowed lands by ditching and diverting the waters of the Pitt River away from the same at times of the high flow of said river during the months of June, July, August, and September when the defendants used the comparatively small amount of the water of the river appropriated by them. The trial court denied the injunction sought and this court affirmed its order to that effect, saying: "The only point made for a reversal is that the court erred in not granting an injunction against the respondent, because appellants were riparian owners and as such 'entitled to have the stream flow in its natural channel, undiminished and unobstructed.' In a state like this, where irrigation is greatly needed, and where large areas of land are comparatively worthless unless artificially irrigated, it is difficult to lay down a rule as to riparian rights which will be applicable to and cover all cases. It

seems clear, however, that in no case should a riparian owner be permitted to demand, as of right, the intervention of a court of equity to restrain all persons who are not riparian owners from diverting any water from the stream at points above him, simply because he wishes to see the stream flow by or through his land undiminished and unobstructed. In other words, a riparian owner ought not to be permitted to invoke the power of a court of equity to restrain the diversion of water above him by a nonriparian owner, when the amount diverted would not be used by him, and would cause no loss or injury to him or his land, present or prospective, but would greatly benefit the party diverting it. If this be not so, it would follow, for example that an owner of land bordering on the Sacramento River in Yolo county could demand an injunction restraining the diversion of any water from that river for use in irrigating nonriparian lands in Glenn or Colusa county. And yet no one, probably, would expect such an injunction, if asked for, to be granted, or, if granted, to be sustained.'' In the case of *Fifield* v. *Spring Valley Water Works*, 130 Cal. 552 [62 Pac. 1054], this court applied the rule above quoted from the last cited case to a situation wherein the defendant, a nonriparian appropriator, was seeking to divert the storm or flood waters of a stream but none of the ordinary flow. In the case of *Miller & Lux* v. *Madera Canal etc. Co.*, 155 Cal. 59 [22 L. R. A. (N. S.) 391, 99 Pac. 502], which has already been adverted to as to its facts, it was urged upon this court upon petition for rehearing that it had not given due consideration to its rulings in the cases of *Modoc Land Co.* v. *Booth*, and *Fifield* v. *Spring Valley Water Works*, last above referred to, but this court differentiated between the two cases last above referred to and the case of *Anaheim Water Co.* v. *Fuller*, *supra*, and also between those former cases and the instant case before it, by showing that the instant controversy was not one relating merely to storm or flood waters, but that the pending cause involved the usual and customary flow of the Fresno River and the right of a lower riparian owner thereto as against an upper appropriator of the waters of said stream. In the course of this differentiation, Mr. Justice Sloss, after approving the language of the main opinion to the effect that the owners of land bordering upon such a

flow of water are riparian proprietors entitled to all the rights pertaining to riparian ownership, went on to say: "It is suggested that a different rule should apply in a semi-arid climate like that of California, where the fall of rain and snow occurs during only a limited period of the year, and, consequently, streams carry in some months a flow of water greatly exceeding that flowing during the dry season, with the result that such increased flow is not, at all points, confined within the banks which mark the limits of the stream at low water. But no authority has been cited, and we see no sufficient ground in principle, for holding that the rights of riparian proprietors should be limited to the body of water which flows in the stream at the period of greatest scarcity. What the riparian proprietor is entitled to as against nonriparian takers is the ordinary and usual flow of the stream. There is no good reason for saying that the greatly increased flow following the annually recurring fall of rain and melting of snow in the region about the head of the stream is any less usual or ordinary than the much diminished flow which comes after the rains and the melted snows have run off. Perhaps other considerations should apply where a river, in times of heavy flow, runs over its banks in such manner that large volumes of water leave the stream and spread over adjoining lands to an indefinite extent, there to stagnate until they evaporate or are absorbed by the soil. But the evidence of respondent, and this was the evidence on which the court below acted, fails to show that the water which defendant seeks to divert was such 'vagrant water.' The evidence of respondent was to the effect that at all seasons the water of the Fresno River, even though overflowing the banks of the channel in which it flowed during the dry season, formed a single and, continuously flowing stream. The argument that the method of irrigation adopted by plaintiff, i. e., that of having the annual increased flow of the river spread over its lands, was not a reasonable use of the water can have no weight in this case. The doctrine that a riparian owner is limited to a reasonable use of the water applies only as between different riparian proprietors. As against an appropriator who seeks to divert water to nonriparian lands, the riparian owner is entitled to restrain any diversion which will deprive him of the customary flow of water which is or may be beneficial to his

land. He is not limited by any measure of reasonableness. If any doubt ever existed on this point, none can remain since the recent decision of this court in *Anaheim Union Water Co.* v. *Fuller,* 150 Cal. 327 [11 L. R. A. (N. S.) 1026, 88 Pac. 978]. The cases relied on to show that the riparian owner is entitled to only a reasonable use of the water were all cases of controversies between owners of different parcels of land riparian to the same stream. Virtually the same point is presented by the argument that plaintiff is not limiting itself to the most economical manner of using the water. This is not an objection which may be raised by an appropriator who seeks to divert water of the stream to non-riparian lands. It is argued that unless appropriators are permitted to divert and store for future use water which would otherwise run into the sea and be wasted, there will be a failure to make the most beneficial use of the natural resources of the state and that riparian owners should not be permitted to obstruct the development of these resources. It may be that, if nonriparian owners are permitted to intercept the winter flow of streams, in order to irrigate nonriparian lands, or to develop power, the water so taken will permit the cultivation of more land and benefit a greater number of people than will be served if the flow continues in its accustomed course. But the riparian owners have a right to have the stream flow past their land in its usual course, and this right, so far as it is of regular occurrence and beneficial to their land, is, as we have frequently said, a right of property, 'a parcel of the land itself.' Neither a court nor the legislature has the right to say that because such water may be more beneficially used by others it may be freely taken by them. Public policy is at best a vague and uncertain guide, and no consideration of policy can justify the taking of private property without compensation. If the higher interests of the public should be thought to require that the water usually flowing in streams of this state should be subject to appropriation in ways that will deprive the riparian proprietor of its benefit, the change sought must be accomplished by the use of the power of eminent domain. The argument that these waters are of great value for the purposes of storage by appropriators and of small value to the lower riparian owners defeats itself. If

the right sought to be taken be of small worth, the burden of paying for it will not be great. If, on the other hand, great benefits are conferred upon the riparian lands by the flow, there is all the more reason why these advantages should not, without compensation, be taken from the owners of these lands and transferred to others.'' The case of *Arroyo Ditch & Water Co.* v. *Baldwin,* 155 Cal. 280 [100 Pac. 874], cannot be said to be at variance with the foregoing principles or cases since the questions discussed therein arose in an action wherein a lower riparian proprietor was claiming the right gained by prescription as against the upper riparian owner to have a certain *quantum* of the waters of the common stream flow down to him for purposes of diversion. The court in such a case was not called upon to discuss the principles enunciated in the case of *Miller & Lux* v. *Madera Canal etc. Co., supra,* but doubtless had that case in mind since it is reported upon earlier pages of the same volume of our reports; and whatever the court may have said in developing the later case cannot be held to be in anywise hostile to its utterances in the earlier one. Neither do we find anything in the case of *Gray* v. *Reclamation Dist.,* 174 Cal. 622 [163 Pac. 1024], or in the earlier case of *Lamb* v. *Reclamation Dist.,* 73 Cal. 125 [2 Am. St. Rep. 775, 14 Pac. 625], each dealing with the particular situation therein considered, which is in conflict with the case of *Miller & Lux* v. *Madera Canal etc. Co., supra,* and its companion line of cases which seem to deal with the identical situation as to the state and flow of the streams in question presented by the case at bar. We are unable to draw the differentiations which the appellant and certain of the *amici curiae* herein would have us see between the case of *Miller & Lux* v. *Madera Canal etc. Co.,* and this one in the foregoing regard; nor are we referred either by appellant or the *amici curiae* to any later decision of this court which has materially modified the decision in the last above cited case in its application abstractly to the rights of riparian owners to the usufruct of streams identical in their origin and outflow to that of the San Joaquin River.

As a result of the foregoing review of the cases which have succeeded and have generally followed the doctrine declared in the early case of *Lux* v. *Haggin, supra,* we arrive at the

following conclusions: The waters of the San Joaquin River as they approach and pass along, through, and over the lands of the plaintiffs herein at all seasons of the year constitute the ordinary, usual, periodical, and natural flow of said river. They are not "flood" waters, or "storm" waters, or "vagrant" waters, or "enemy" waters which are the result of occasional or unusual freshets and which anyone having the ability so to do may impound or divert, and who in most cases confer a blessing upon lower riparian land owners by so doing. The plaintiffs herein are riparian owners along the course or courses of the San Joaquin River and their tract of land is practically all riparian to said river, either directly along and beside the main channel thereof or through the contiguity of the upper portions thereof to the numerous sloughs putting off from said river and interpenetrating these higher areas of their said tract of land. As such riparian owners said plaintiffs are abstractly entitled to the reasonable use of the said waters of said river at all seasons of the year. Their right thereto is to the usufruct of said flowing stream in the usual and ordinary course of its flow, and this right is a vested right inherent in the soil of their said lands and not a mere incident or appurtenant thereto. It is a right which is neither gained nor lost by use or disuse abstractly and in the absence of adverse rights gained by others by prescription or of their loss by laches creating an estoppel under certain conditions hereinafter to be noted. It is a right which they partake of in common with other riparian proprietors along said stream entitled to a similar usufruct in its waters. It is a right which appropriators of water from said stream do not, as we shall see, share with the riparian owners thereon in the absence of rights to the use of said waters gained by such appropriators by grant or by prescription.

Having thus defined and limited the right of the plaintiffs as riparian owners along the San Joaquin River to the use and enjoyment of the waters thereof, we pass next to the question as to what the trial court has found to be the extent of the plaintiffs' right to the reasonable use and enjoyment of the waters of said stream under the particular circumstances as shown by the evidence in the case. The trial court found, as we have seen, that practically all of the plaintiffs' tract of land is riparian to said river. The trial court has further

found specifically what particular benefit the various areas of the plaintiffs' said tract of land of different elevations derive from the intake, flow, and overflow of the waters of said river through and by means of the several sloughs which take off from said river at such respective elevations in the land, and which carry a varying content according to their location, and also to the amount of accretion in the flow of the river at certain seasons of the year. Having so found, the trial court proceeds to find as follows: "That the climate of that portion of the San Joaquin Valley in which the said land described in said Schedule A is located is naturally arid, and the annual rainfall is very slight, and, as a result thereof, the said land, unless irrigated otherwise than by annual rainfall, is unfit for cultivation or the growing of profitable crops, but the soil, 10,000 acres or more thereof, is very fertile and by the use of said waters of the San Joaquin River and its branches, is rendered very productive and abundant crops of natural grasses can be and are produced thereon, as herein specifically stated, and with water to irrigate the same the said land is adapted to the growing of cereals, viticultural and horticultural crops, vineyards, garden truck, grain and berries. The balance of said soil blends with different degrees of alkali from the quality of said 10,000 acres of land to land impregnated with alkali in such quantities that the land must be reclaimed from it in order that anything other than natural grasses will grow thereon, and the process of this reclamation of the land from alkali is being accomplished by the overflow aforesaid." The trial court further found: "That all the water which will flow in the San Joaquin River and its branches, as it and they were wont to flow by nature would be beneficial to the land of plaintiffs which is overflowed thereby as aforesaid, for the entire period and in the entire quantity that it is accustomed to so overflow said land." The foregoing findings of the trial court are, in our opinion, sufficiently supported by the evidence in the case. We are further entirely satisfied that the foregoing utilization by the said plaintiffs of the waters of said river and the flow and underflow and overflow thereof constitutes a reasonable use thereof within the intent and meaning of the foregoing definitions of the riparian right of land owners along such or similar

streams. It is to be noted that apart from certain general similarities of location, topography, adaptability, and quality the plaintiffs' tract of land as to its position, adaptability, and soil qualities, when taken in its relation to the San Joaquin River and the aforesaid natural distribution of the waters thereof, is peculiar, and in fact unique. From the evidence in the case as reflected by the findings of the trial court it would seem to be a tract of land especially designed and equipped by nature for pastoral uses; but even if it were not thus peculiarly adaptable to the irrigation and growth of wild grasses for the pasture of stock; even if it were equally or even more advantageously susceptible of adaptation to more intensive and even more profitable agricultural, horticultural, or viticultural uses, we are unable to perceive under what showing or claim of right any other land owner along said river, or any would-be appropriator of the waters thereof, or any aggregation of individuals, or any court or even the state itself, would have the right to dictate to these plaintiffs, choosing to devote their said lands and the water which, in its ordinary and usual flow, as an integral part and parcel thereof, to its present beneficial uses, that they should devote their said lands and the water flowing thereon to other and more intensive uses which such individuals or such aggregation or such court or such state might deem to be more in keeping, and, so to speak, more up to date with modern development in the productive uses of property. To admit the right to such interference to the extent of taking away from the individual his initiative in deciding to which of several adaptable uses he shall devote his property would be to divest him to that extent of his most precious right of ownership therein. In so stating we are not to be understood as dealing with or denying the right of the state in the proper exercise of its police power to regulate the uses, within certain well-defined limitations, of private property. We shall revert to this subject at a later point in this opinion.

[6] It is, however, contended by the defendants herein that the trial court placed a vital limitation upon its foregoing findings as to the extent of the right of the plaintiffs to the use and flow of the entire body of the waters of said river entering upon and flowing through and over their said lands by appending thereto and to the last above quoted

portion of finding "30" an additional sentence which would make said finding "30" read in full as follows: "That all the water which will flow in the San Joaquin River and its branches, as it and they were wont to flow by nature would be beneficial to the land of plaintiffs which is overflowed thereby as aforesaid, for the entire period and in the entire quantity that it is accustomed to so overflow said land, *but a constant flow of 180 cubic feet of water per second from April 1st to October 1st of each year would irrigate the lands of plaintiff, if the same were prepared for intensive cultivation, which preparation would entail a large expenditure of money,* but in the present condition of the land all the water flowing in said main and branch channels is necessary for the irrigation of said land." We are unable to perceive that the emphasized sentence of said finding "30" as above quoted in full amounts to a limitation in any degree upon the foregoing findings of the trial court to which the same is appended. The fact that these plaintiffs might by artificial contrivances through dams and ditches and reservoirs, involving large expenditures of money, so interrupt or so regulate the present natural flow of said river as to render a smaller *quantum* of its waters sufficient to satisfy the beneficial uses which they are now making of such waters in their entirety, could not possibly operate to limit or lessen their riparian right to the usufruct of said waters in their natural course and under plaintiffs' unique relation thereto. Were it otherwise, the clause in our foregoing definition of the riparian right to the effect that such right is neither gained by use nor lost by disuse would be meaningless. But more than that; to require of these plaintiffs that they install expensive improvements upon nature's method for the purpose of lessening the *quantum* of the said water to be used by them below that full amount thereof to which they are in the natural exercise of their riparian right entitled would be to impose a like duty upon all the other riparian owners along the lower reaches not only of this particular stream but of all other streams of like origin and outflow, in order that some upper riparian proprietor or nonriparian appropriator might have, gain, and exercise rights to the use and diversion of said waters thus conserved, to which they would not otherwise be entitled. To so declare would be to impose

a radical and, in its outworking, an utterly impracticable limitation upon the doctrine of riparian rights. The impracticability of such a proposition might, if time and space would permit, be made the subject of almost endless illustration. [7] The rights which the plaintiffs assert herein inhere not only in the upper flow of said waters which actually enters upon and permeates and fructifies the soil of riparian lands, but also in the underflow of said river which lifts the upper flow thereof to the levels of entry upon such lands, and which, having done so, passes by to uplift its peak, in turn, to the levels of lower riparian lands along the course of said river through the plain. The underflow of streams is, with respect to riparian rights therein, no more waste waters than is the upper flow thereof which the riparian owner uses, since without the uplift of the former the outflow and beneficial use of the latter could not exist. Such waters are therefore serving a useful and beneficial purpose in relation to said lands. The foregoing findings of the trial court dispose, we think, of the question as to the reasonableness of the plaintiffs' use of the waters of said river in view of the unique advantages which nature has bestowed upon them in respect to their said lands. Had nature not been thus kind; had the plaintiffs originally been obliged at large expense and by artificial means to dig the watercourses, create the channels, and make the connections at various levels for the intake of the waters of the river to which as riparian owners they were entitled, it could not, we think, be reasonably contended that their conduct in so doing was so unreasonable as to justify upper appropriators upon said stream in taking away their riparian rights in the waters of the stream which they had thus artificially and at great expense applied to their lands. Neither could it be said that the amount of water of said river which is thus lifted to the varying levels of plaintiffs' lands and enters upon and flows over the same by means of the channels which nature has provided is to be held unreasonable merely because it exceeds the volume which the trial court suggested would be sufficient, if conserved and distributed through expensive artificial methods and appliances. As against appropriators the plaintiffs were not obliged by artificial appliances or otherwise to limit their natural use and enjoyment

of the waters of said river, nor can it be said, as supported by either reason or authority, that a lower riparian owner, as against an upper riparian owner attempting to impound a greater amount of the waters of the stream than that to which he would be entitled under his well-defined riparian right, should have cast upon him the burden of limiting by artificial contrivances his natural use and enjoyment of said waters in order that the upper riparian owner may make other and greater uses thereof than those to which he is lawfully and naturally entitled. There is nothing in the record herein tending in any degree to show that the defendants herein ever offered, or would be willing to offer, to reimburse the plaintiffs for any portion of the cost, expense, and outlay which would be required in order to limit the amount of water entering upon plaintiffs' land to the amount thereof indicated by the trial court as susceptible of being made reasonably adequate through such artificial means.

We have now reached the point in this discussion where the rights and claims of right of the appellant in and to the use of the waters of the San Joaquin River and its tributaries come into view. The appellant is a riparian owner of considerable lands along the upper reaches of said river and its tributaries. It is also a lessee or licensee from the United States government of certain other lands in the same region and riparian to the same river; and as such lessee or licensee thereof is admittedly entitled to the use and exercise of whatever riparian rights the federal government has in respect to said river by virtue of its ownership of said lands. It is in its aforesaid capacity as an upper riparian proprietor along said river that its rights as such therein are first to be considered. Generally speaking, it has the same usufruct in the waters of said river as all other riparian owners along the course thereof possess. It is entitled to the reasonable use of said waters and of the ordinary and usual flow thereof for such customary and domestic uses as inhere in riparian owners along similar streams, and for irrigation of their said riparian lands. Being an upper riparian owner along said stream and the tributaries thereof, it is entitled to the benefit of whatever reasonable waste or diminution in the volume of said waters occurs during and

in the course of the reasonable exercise of its riparian rights therein. [8] In addition to the foregoing usual and customary uses of said waters, the appellant is entitled to make appropriate use of the same for the development of power and electric energy. (*Mentone Irr. Co.* v. *Redlands Elec. L. & P. Co.*, 155 Cal. 323 [17 Ann. Cas. 1222, 22 L. R. A. (N. S.) 382, 100 Pac. 1082].) In so holding this court further held that the production of power upon riparian land was a proper riparian use of the waters flowing thereon, even though the power and energy so developed was to be conveyed away and used at distant points not riparian to such lands. The uses made by the defendants herein as upper riparian proprietors of the waters of said river for purposes of irrigation and for domestic uses are negligible and are not in dispute in this proceeding; and as to the use of said waters for the production of power and electric energy the plaintiffs herein concede to the defendants the right to such use as being within the defendants' riparian right, subject, of course, to the duty imposed upon all riparian owners and users of water to make a present return of such waters to the course of the stream without undue waste or diminution. [9] This concession does not satisfy the claims of the defendants herein or of the various *amici curiae* who have come forward to support the defendants' contentions as to the extent of their rights as upper riparian proprietors to the use, for the aforesaid purpose, of the waters of said river. These claims of the defendants are set forth in their answer herein where they appear in the form of several separate defenses, which we shall deal with in turn. The first of these affirmative defenses consists in the claim of the defendants that in the course and exercise of their conceded right to a reasonable use of the waters of said stream for the development of power and electric energy they have the right to build reservoirs at various points along the upper reaches of said river and the tributaries thereof for the storage of the waters of said river to the extent set forth with much of detail in their said answer. With reference to the averments therein, and to the past, present, and prospective work of said development in the planning and building of such reservoirs, a vast amount of evidence was presented at the trial of the cause. The trial court found that the said defendants did

claim and assert their right to construct such reservoirs to the extent and capacity shown by the evidence in the case and set forth with much of detail in the findings therein; and the trial court further found from such evidence that the proposed sequestration of the waters of said river, in the system of reservoirs shown to be partially in course of construction and wholly within ' the contemplation and plans of the defendants, would, if permitted to be completed and carried into operation according to their aforesaid claims and plans and purposes, have the effect of causing a diversion of the waters which constitute the usual and ordinary flow of said river for periods and to an extent which would practically effectuate a withdrawal of said waters from a large portion of the lands of said plaintiffs during the period in each season when they are benefited by its flow and overflow, especially in and through those sloughs and channels which are wont to convey such waters to the plaintiffs' higher lands. The conclusion of law of the trial court based upon its foregoing findings of fact was that the claim of right asserted by said defendants, in so far as the same was sought to be grounded in the alleged rights of the defendants as upper riparian proprietors along the course of said river, was not sustainable as a matter of law. We are asked upon this appeal to review and reverse that conclusion. We are not urged so to do upon the ground that the evidence presented at the trial does not fully sustain the findings of fact of the trial court upon which its aforesaid conclusion of law was predicated. On the other hand, the defendants frankly admit that their proposed plans for the storage of the waters of said river in its vast system of reservoirs hold in contemplation the retirement of said waters for long and indefinite periods of time; in fact, admit that as to certain of said reservoirs the sequestration of the portion of the said waters stored therein will be cyclic; and as to said waters as a whole and to the extent of their retention in said reservoirs, their ultimate return to the river would depend not at all upon the claims and asserted rights of lower riparian owners to the usual, natural, and ordinary flow of said waters, but altogether upon the will and convenience of the defendants in their proposed utilization of said waters for power production. The defendants do not, in support of their aforesaid claim of right, in so far as the same is based solely upon

riparian ownership, direct our attention to any decision by the courts of this state which does more than vaguely hint at any possible merit in such a claim. We are, however, referred to a line of decisions by the courts of certain of the older states wherein a qualified right of an upper riparian proprietor to impound the waters of a stream has been recognized. We have examined these cases only to find that they have reference in the main to a mere temporary detention of water by dams during periods of scant flow in order to the uninterrupted operation of mills or water-wheels which would otherwise be insufficiently supplied with their usual and expected *quantum* of water required for their continued activities, the water being presently returned to the stream. Such cases have no bearing upon such an extensive, prolonged, and indefinite storage, withdrawal, and sequestration of the waters which form the usual and ordinary flow of such a stream as the San Joaquin River to the inevitable detriment of not one but all of the lower riparian owners and users of such waters. The asserted right of the defendants herein as riparian owners along said river and incidentally the asserted rights and claims of all those who have appeared herein as *amici curiae* claiming similar rights in similar rivers in this state would, if permitted, put an end to the whole doctrine of riparian rights, not only as to these plaintiffs and all other lower riparian owners similarly situated, but also as to the defendants themselves; since any person or aggregation of persons having the financial ability and acquiring a riparian ownership in lands above those of the defendants along the yet higher reaches of said river would thus become entitled to exercise all the rights which the defendants are here claiming, even against them, with the resultant drying up of the defendants' own reservoirs. [10] Two answers might well be suggested to the claims of the defendants and of their supporting *amici curiae* of a present right to thus break down and destroy the long-established doctrine of riparian rights upon the ground of public policy. One of these is to be found in the apt expression of our Chief Justice Shaw in his admirable review of the "Development of the Law of Waters in the West" above referred to, wherein he says: "The obvious answer on the question of policy is that the objection comes too late, that it should have been made to the legislature in 1850 prior to the enact-

ment of the statute adopting the common law. When that was done the riparian rights became vested, and thereupon the much more important public policy of protecting the right of private property became paramount and controlling. This policy is declared in our constitutions, has been adhered to throughout our national history, and it is through it that the remarkable progress and development of the country has been made possible." And the other equally apt answer is to be found in the opinion of Mr. Justice Sloss in the case of *Miller & Lux* v. *Madera Canal etc. Co., supra,* wherein that learned jurist said: "The riparian owners have a right to have the stream flow past their land in its usual course, and this right, so far as it is of regular occurrence and beneficial to their land, is, as we have frequently said, a right of property, 'a parcel of the land itself.' Neither a court nor the legislature has the right to say that because such water may be more beneficially used by others it may be freely taken by them. Public policy is at best a vague and uncertain guide, and no consideration of policy can justify the taking of private property without compensation. If the higher interests of the public should be thought to require that the water usually flowing in streams of this state should be subject to appropriation in ways that will deprive the riparian proprietor of its benefit, the change sought must be accomplished by the use of the power of eminent domain. The argument that these waters are of great value for the purposes of storage by appropriators and of small value to the lower riparian owners defeats itself. If the right sought to be taken be of small worth, the burden of paying for it will not be great. If, on the other hand, great benefits are conferred upon the riparian lands by the flow, there is all the more reason why these advantages should not, without compensation, be taken from the owners of these lands and transferred to others." [11] The defendants herein, however, make the contention that the foregoing disastrous consequences to the plaintiffs particularly and to the law of riparian rights generally will not occur for the reason, as they expressly plead and show, the said defendants have entered into a certain original contract and certain supplementary contracts thereto with Miller & Lux, a riparian owner of large tracts of land in the same immediate region as are the lands of these plaintiffs, and that the de-

fendants' obligations under said contracts compel them to a certain limited reservoiring of the waters of said river, dependent upon the consent of their co-contractor and to the making of certain releases and restorations of the said impounded waters to and also at the will of the other party to said agreement. It would be illuminating to quote these contracts in full for the purpose of showing the admissions which this appellant made therein as to the particular lower riparian owner with which it was dealing as to the right of the latter to the full ordinary flow of the waters of said stream; but we deem it sufficient to say at this point in the opinion with relation to said contracts that these plaintiffs were not parties thereto or otherwise bound or other than indirectly benefited thereby; and that said contracts between the parties thereto were of course subject to change or even abrogation by the parties thereto at any time and that without the plaintiffs' concurrence or consent. They cannot, therefore, be held to have their individual rights to require that the waters of said river be permitted to continue to unobstructedly flow as by nature they are wont to do affected by the existence of private agreements between other riparian owners along said stream to which they were not parties. A further consideration of these contracts may become appropriate at a later point in this opinion.

[12] We have thus disposed, we think, of the assertion by the appellant of a right to reservoir and indefinitely divert and detain the waters of this stream to the extent claimed by it merely as an upper riparian owner to the detriment of the plaintiffs as shown by the evidence in the case and the findings of the trial court sufficiently based thereon. The appellant makes the further claim of right to reservoir, sequester, and eventually use the waters of said river to the full extent of its disclosed plans in that regard based upon its asserted right so to do as an appropriator of the waters of said stream. Primarily, it may be said that in so far as the rights and claims of the appellant as an appropriator rest upon the contention that the waters in and to the use or diversion of which such rights and claims are asserted are flood or waste waters of said stream, that contention has been fully disposed of by what has been decided in an earlier part of this opinion. In so far as the

appellant claims any right arising out of its previous appropriation of the water of said river made under and in conformity with sections 1410 to 1422, inclusive, of the Civil Code relating to the acquisition of waters in this state by appropriation in accordance with the method therein provided, such claim of right is sufficiently disposed of by the numerous decisions of this court which are collated and commented upon in the case of *Duckworth* v. *Watsonville Water Co.*, 170 Cal. 425 [150 Pac. 58], wherein Mr. Justice Shaw made the following significant statement: "The argument on this point is partly, if not entirely, based on the theory that an appropriation of water, under the code, constitutes a grant by the state of a right to take the water appropriated, a grant which confers upon the appropriator a title or right to the water superior to private rights, riparian or otherwise, existing at the time of the appropriation. This theory seems to persist in the minds of members of the bar. It finds no support in the decisions of this court. It has long been settled in this state that an appropriation under the code divests no existing private right, that its effect is merely to give a preference over a subsequent appropriator or diverter who takes under no other right or title, and to fix the date of the posting of the notice as the inception of the claim under it. (*De Necochea* v. *Curtis*, 80 Cal. 402, 405 [20 Pac. 563, 22 Pac. 198]; *Wells* v. *Mantes*, 99 Cal. 584 [34 Pac. 324]; *Alta Land Co.* v. *Hancock*, 85 Cal. 223 [20 Am. St. Rep. 217, 24 Pac. 645]; *Cave* v. *Tyler*, 133 Cal. 566 [65 Pac. 1089]; *Santa Cruz* v. *Enright*, 95 Cal. 113 [30 Pac. 197]; *Frederick* v. *Dickey*, 91 Cal. 358 [27 Pac. 742]; *Coonradt* v. *Hill*, 79 Cal. 593 [21 Pac. 1099]; *Watterson* v. *Saldunbehere*, 101 Cal. 112 [35 Pac. 432]; *Lux* v. *Haggin*, 69 Cal. 390 [4 Pac. 919, 10 Pac. 674]; *Palmer* v. *Railroad Com.*, 167 Cal. 168 138 Pac. 997].)" [13] In the petition for rehearing in the above last cited case it was particularly insisted that a significant change had been made in section 1410 of the Civil Code by the amendment thereof in 1911, whereby it was claimed the rights of appropriators of waters were greatly enlarged. In disposing of that contention this court said: "It ought not to be necessary to remind anyone that a law of this character is not retroactive, or that it cannot operate to divest rights already vested at the time it was enacted. The amendment may possibly be effective as a

dedication to general public use of any riparian rights which the state, at the time it was enacted, may still have retained by virtue of its ownership of lands bordering on a stream, rights in the stream which it would in such cases have in common with owners of other abutting land. It could not affect the riparian rights of the other owners, nor the rights of any person or corporation claiming under them, nor rights previously acquired from riparian owners by prescription, nor rights acquired from the state prior to that time by appropriation under the code, in reliance upon the implied offer of the state to allow its riparian rights to be acquired in that manner, as indicated in the opinion." In the yet more recent case of *San Bernardino* v. *Riverside*, 186 Cal. 7 [198 Pac. 784], the foregoing views of this court upon this subject were restated and approved.

[14] The appellant herein, however, contends that it has gained certain definite additional rights as an appropriator of the waters of said river by virtue of the provisions of the so-called Water Commission Act of 1913 (Stats. 1913, p. 1012), and of the various later acts of the legislature supplementary to or amendatory thereof. In this claim the appellant is quite ardently supported by certain *amici curiae* asserting similar enlarged rights to the use of the waters of the various streams of this state having their sources in the high Sierras. Sections 11 and 42 of said act are the portions thereof whereupon the appellant and the *amici curiae* who agree with it rely for the asserted right to reservoir and store practically unlimited amounts of the waters of this and other rivers of this state. The portion of section 11 thereof, thus relied upon, reads as follows: "All waters flowing in any river, stream, canyon, ravine or other natural channel, excepting so far as such waters have been or are being applied to useful and beneficial purpose upon, or in so far as such waters are or may be reasonably needed for useful, and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is and are hereby declared to be public waters of the State of California and subject to appropriation in accordance with the provisions of this act. If any portion of the waters of any stream shall not be put to a useful or beneficial purpose to or upon lands riparian to such stream for any continuous period of ten con-

secutive years after the passage of this act, such non-application shall be deemed to be conclusive presumption that the use of such portions of the waters of such stream is not needed upon said riparian lands for any useful or beneficial purpose; and such portion of the waters of any stream so non-applied, unless otherwise appropriated for a useful and beneficial purpose is hereby declared to be in the use of the state and subject to appropriation in accordance with the provisions of this act.'' In so far as the foregoing portion of said section of said act is concerned it would seem to have no application to the facts of the instant case, since, as we have seen, the trial court has found upon what we deem sufficient evidence that all of the waters flowing in the San Joaquin River down to and upon and over the lands of the plaintiffs herein have been and are being applied to useful and beneficial purposes upon the plaintiffs' said lands riparian thereto and have been so applied by them for more than ten consecutive years last past. It follows that such waters are not the proper subject of appropriation under the express terms of said section of said act. Section 42 of said act reads as follows: ''The word 'water' in this act shall be construed as embracing the term 'or use of water'; and the term 'or use of water' in this act shall be construed as embracing the word 'water.' Whenever the terms stream, stream system, lake or other body of water or water occurs in this act, such term shall be interpreted to refer only to surface water, and to subterranean streams flowing through known and definite channels. But nothing in this act shall be construed as giving or confirming any right, or title, or interest to or in the corpus of any water; *provided,* that the term 'useful or beneficial purposes' as used in this act shall not be construed to mean the use in any one year of more than two and one-half acre feet of water per acre in the irrigation of uncultivated areas of land not devoted to cultivated crops.'' It is the contention of appellant herein and its supporting *amici curiae* that the concluding clause in the section above quoted expressly so limits the language of section 11 thereof above referred to in respect to the term ''useful or beneficial purposes,'' used therein as to confine riparian owners using the waters of the rivers and streams of this state for the irrigation of uncultivated areas of their

said lands "not devoted to cultivated crops" to the use in any one year of not to exceed two and one-half acre-feet of water per acre of their said riparian lands. [15] The only possible theory upon which the legislature of this state could be conceded to be empowered to arrogate to itself the right to determine what are the "useful and beneficial purposes" to which lands held in private ownership shall be devoted or to which those riparian rights which are an integral part and parcel of such lands and which are already vested rights shall be limited in their use and enjoyment to the extent declared in the above-quoted concluding clauses of section 42 of said Water Commission Act is that put forward by certain of the *amici curiae* herein to the effect that such an arrogated act of legislation is justifiable as a proper exercise of the police power of the state. It may be conceded that the phrase "police power of the state" has, as to its scope and meaning been subjected to a quite severe strain of recent years in the endeavor to so expand it as to cover all sorts of legislation sought to be enacted in the asserted interest of modern progress; but we have yet to be referred to a case wherein it has been judicially so far expanded as to invest the legislative department of this state with arbitrary power to destroy vested rights in private property when such rights are being exercised and such property is being employed in the useful and in nowise harmful production of wealth, and when such use and the product thereof cannot be said or shown to be inimical to public health or morals or to the general welfare; but, on the contrary, must be conceded to be beneficial to each and all of these. The use to which the owners of lands contiguous to a river devote its soil by the aid of the waters of such river in the annual production of crops or cattle is such a use. The extent to which such riparian land owners need, and use, and are entitled to have the benefit of the flow and overflow of such waters under their vested riparian rights therein is a matter which depends upon the circumstances of each particular case; upon location, aridity, rainfall, soil porosity, responsiveness, adaptability to particular forms of production, and many other elements which render the question essentially one for judicial inquiry and determination in all cases involving the proper use of water upon both cultivated and

uncultivated areas. To concede that the state legislature has the right arbitrarily to fix as to the latter the amount of water which the riparian proprietor may take and use thereon would be to concede an equal power to make a like arbitrary fixation in respect to cultivated areas also, entirely regardless of the foregoing elements which are necessarily the determining factors in such fixation. To concede this would be to concede to the legislative department of the state government the arbitrary power to destroy vested rights in private property of every kind and character. In the case of *Tulare Water Co.* v. *State Water Com.*, 187 Cal. 533 [202 Pac. 874], this court had under consideration the extent to which the state had attempted to invest the said commission under the Water Commission Act above referred to with judicial power to determine what is and what is not water subject to appropriation under the terms of said act. In the main opinion holding that such a question would be a judicial question which said commission could be invested with no power to decide, Mr. Justice Sloane said: "What is unappropriated water is a constantly fluctuating question, depending upon the seasonal flow of the stream, the annual rainfall, the forfeiture of prior appropriations and default in the use of riparian rights. To conclude the rights of would-be appropriators by the extrajudicial and perhaps arbitrary action of a board of water commissioners would be to deprive such applicant of a valuable property right without due process of law." In a concurring opinion, Mr. Chief Justice Shaw, approving this conclusion, states in apt and terse sentences, enforced by ample citation of authority, that the effect of section 1 of article VI of the constitution is to vest in the courts the entire judicial power of the state, and that it is not within the power of the legislature to vest in any other state body any general judicial power to establish and declare the right and title to private property. If this be true it must be equally and obviously true that whatever of judicial power the legislature cannot confer upon agencies of its own creation, other than courts, it cannot arrogate to itself the right to exercise. It is to be noted as highly significant in this immediate connection that the numerous *amici curiae* who have presented briefs upon this appeal are in quite radical and vigorous disagreement as to

the proper basis of the appellant's asserted rights in the premises. The appellant claims the right to invoke public policy and the police powers of the state in aid of its project for the sequestration of the waters of the San Joaquin River to the full extent of such proposed sequestration, and lays claim to this right both as a riparian owner and as an appropriator of the waters of said stream. The attorney-general of this state appears as *amici curiae* herein to assert that the public interest is directly opposed to the extension of the riparian right so as to include the storage of waters, and that to accord the appellant that right to anything like the extent of its asserted claim would destroy the basis of rights on which much present development in this state depends, and render insecure the basis of rights for much future development. In this insistence the attorney-general is joined by the United States Bureau of Reclamation and by the Irrigation District Association of California, embracing a score or more of the districts of this state. The latter, however, while insisting that the right of storage of these waters should be denied to the appellant as a riparian owner, argues that such right should be allowed to it as an appropriator where such diversion will not result in injury to lower riparian owners. The James J. Stevinson Company, a corporation, and an extensive owner of lower riparian lands upon said river, appears as *amicus curiae* to protest against the exercise of the asserted rights of the appellant to the diversion and storage of the waters of said stream either as a riparian owner or as an appropriator, and to urge that the state possesses no power to enact legislation such as that attempted by the Water Commission Act which would have the effect of destroying already vested rights of riparian owners as established by this court in *Lux* v. *Haggin, supra,* and since repeatedly reaffirmed in the cases already cited in this opinion. Certain other public utility power companies appear by eminent counsel to uphold in its entirety the claim of the appellant. ''When doctors disagree who shall decide'' as to where the public interest and public welfare lie? Or who shall venture to say that these lie altogether on the side of those *quasi*-public corporations or associations, which, while fulfilling certain public utility functions, are nevertheless organized primarily for private gain, as against the lesser

material interests, but not less vitally important vested rights in private property, in the other scale of the balance? If the state were here assaying to uphold an effort on its part to work out impartially, unselfishly and in the interests of the whole people some general plan or system for the equitable adjustment of rights and uses in its flowing streams with a view to the conservation, development, and distribution of the dynamic forces and generative and fertilizing fructibilities of their waters, it might well be argued that public policy, public interest, and a most liberal interpretation of the police powers of the state might rightfully be invoked in support of such an effort. But can the same be properly said or claimed in a case wherein one or many privately owned and operated institutions, organized primarily for personal and private gain, and only incidentally and secondarily assuming to act in the public interest and welfare, are engaged in controversies in the courts with other private individuals or associations over the asserted and disputed property rights and interests of each of the respective parties to such controversies? We do not feel called upon in this case to so declare.

[16] It is further urged by the appellant herein, and also by certain *amici curiae* having identical aims and interests to those of the said appellant, that because of the fact that this appellant is a lessee and licensee of the United States government, which is the owner of certain of the lands through which the San Joaquin River and its tributaries flow, and on which are or will be located certain of the reservoirs and storage systems now in course of construction or contemplated by it, and because of the fact that the San Joaquin River is a navigable stream, and because the United States government in aid of commerce is in control of all navigable rivers, and because of the fact that the United States government has not only in the past expended large sums of money in the improvement of navigation along the lower reaches of said river but has in more recent years adopted the act of Congress known as the Federal Water Power Act (41 U. S. Stats. at Large, 1063), which said act was intended, among its other purposes, to promote the improvement of navigation upon and along navigable rivers; and because under the provisions of said act and in aid of

the administration thereof the appellant has been granted leases and licenses to enter upon, occupy, and use the said lands of the United States and to construct, operate, and maintain thereon a large portion of its contemplated system of reservoirs and storage plants for the purpose of conserving and storing the waters of said river and of thereby developing and transmitting electric power, that said appellant in so doing will be exercising and carrying forward the plans and purposes of the United States government in aid of the navigation of said river, and that in so doing it is in the rightful possession of rights and powers superior to those possessed and claimed by the plaintiffs as lower riparian owners along said stream. In aid of the foregoing assertion of the appellant herein it may be stated that the attorney-general of the United States has authorized the presentation by oral argument and by briefs as *amicus curiae* of the views of that department of the federal government in support of the appellant's aforesaid claims. We do not deem it necessary in this case to consider or attempt to determine what the full powers and rights of the United States government may be by virtue of the fact that it continues to be the owner of public lands along the upper reaches of navigable rivers and their tributaries beyond the point of their possible or practical navigability. It will suffice for the purposes of the present case to state that the findings of the trial court disclose that the United States government has neither expressly nor by any fair or reasonable implication undertaken to transfer to the appellant herein any right or authority to exercise whatever rights or powers the federal government may possess or be entitled to exercise in aid of navigation upon said river; nor does it appear therefrom, nor was it made to appear by any evidence in the case, that the proposed plans and projects of the appellant for the sequestration, storage, and use of the waters of said stream would be in any degree in aid of navigation. On the contrary, the evidence in the case disclosed that the appellant's proposed sequestration and storage of said waters contemplated the diversion from said river of a very large *quantum* of its waters; that such sequestration thereof was to continue for long and indefinite periods of time regardless of the seasonal flow of said river and that certain large and important units of its said proposed reser-

voir and storage systems were to be cyclic. It further appeared by both the pleadings and evidence offered by the appellant itself that it was under certain contracts with Miller & Lux Corporation, a very large lower riparian owner of said stream and user of the waters thereof for irrigation and other uses, not to return the said waters when finally released by it to said river in aid of navigation, but to deliver the same to the other party to said contracts in furtherance of its private and particular uses thereof as such riparian proprietor along said stream. Under such a state of the record we utterly fail to perceive upon what possible theory the appellant herein can predicate its asserted right as the lessee and licensee of the federal government to a superior use of the waters of said river as in aid of navigation.

[17] Finally, the appellant herein has pleaded and attempted to prove an estoppel on the part of the plaintiffs to interfere with the appellant's alleged project and plans for the construction of its proposed system of reservoirs and storage plants upon the upper reaches of said river and its tributaries arising out of their laches in the assertion of their right to the injunctive processes of the courts if such right they ever had. We do not deem it necessary in this already much extended opinion to go into the details of the appellant's averments and proofs in support of its said plea of estoppel, further than to say that the findings and conclusions of the trial court sufficiently dealt with said matter and that such findings and conclusions were fully supported by the evidence in the case. The trial court found that as to the appellant's constructive work upon the Huntington Lake reservoir and also upon the Shaver Lake reservoir and as to the amount of water impounded in each of these the plaintiffs had estopped themselves by laches from asserting the present right to enjoin the maintenance and use of these two reservoirs to the extent of the appellant's past and present utilization of the same and of the waters stored or to be stored therein; but that as to the other and as yet uncompleted and unused units of its reservoir and storage system no such estoppel had been shown. As to the former two reservoirs the trial court exempted them and the appellant's use thereof from the terms of its judgment and from its action in so doing the plaintiffs have taken no appeal. With

respect to the appellant's contention and attempted showing that the plaintiffs had not come into the court of equity with clean hands, we entirely agree with the trial court that there was and is no merit in said contention; nor do we deem it necessary to further elaborate upon other points urged by the appellant and by certain of the *amici curiae* in support of this appeal. The main propositions advanced herein have been given full consideration, and for the reasons educed in the course of such consideration it is ordered that the judgment herein be and the same is hereby affirmed.

Waste, C. J., Curtis, J., Seawell, J., and Sullivan, J., concurred.

SHENK, J.—I dissent. The decision in this case is important because of its effect generally upon the conservation of the waters of the state. The main opinion, it seems to me, will result in checking the progress of the state of California in conserving this most important natural resource. It unnecessarily pulls the teeth of the Water Commission Act. In order to have the beneficial use of less than one per cent of the maximum flow of the San Joaquin River on their riparian lands the plaintiffs are contending for the right to use the balance in such a way that, so far as they are concerned, over ninety-nine per cent of that flow is wasted. This is a highly unreasonable use or method of the use of water. The opinion not only supports the plaintiffs in that contention, but invalidates sections 11 and 42 of the Water Commission Act which constitute an endeavor on the part of the state to gather unto itself the waters of the state not used for a reasonably beneficial purpose and make them available for appropriation and use by the state and its inhabitants. It also supports the riparian proprietor in what may be called a vested right to an unreasonable use of water as against an appropriator. It perpetuates the doctrine to that effect announced before the adoption of the Water Commission Act, one of the purposes of which unquestionably was to abrogate the former rule. It affirms the rule laid down in *Miller & Lux* v. *Madera Canal etc. Co.*, 155 Cal. 59 [22 L. R. A. (N. S.) 391, 99 Pac. 502], where it was said that as between a riparian owner and an appropriator the riparian owner is not limited in his use

of the water by any measure of reasonableness. That case was decided in 1909 before the adoption of the Water Commission Act in 1913. In section 11 of that act the legislature has provided that all waters flowing in any river, except in so far as the same are or may be *reasonably needed* for useful and beneficial purposes upon lands riparian thereto or otherwise appropriated, are declared to be public waters of the state and subject to appropriation in accordance with the provisions of the act. In section 42 it is provided that the term "useful or beneficial purpose" as used in the act shall not be construed to mean the use in any one year of more than two and one-half acre-feet of water per acre in the irrigation of uncultivated areas of land not devoted to cultivated crops. These statutory provisions are in line with the declared policy of the state. In *Pabst* v. *Finmand,* 190 Cal. 124, 135 [211 Pac. 11, 15], it was said that "the declared policy of this state [is] to require the highest and greatest duty of water because of the immense importance to the state of the economical use of water," and as stated in *Antioch* v. *Williams Irr. Dist.,* 188 Cal. 451, at page 461 [205 Pac. 688, 693] : "It may without exaggeration be said that the full use of the waters of rivers and mountain streams for irrigation, power, and like beneficial purposes, is absolutely necessary to the continued growth and prosperity of the state."

The rule that limits the right to the use of water to that which is reasonably necessary for beneficial purposes is now general throughout the western states and prevails in this state except as between a riparian owner and an appropriator. The rule of reason in the conservation and use of water has been applied as between appropriators (*California etc. Co.* v. *Madera etc. Co.,* 167 Cal. 78 [138 Pac. 718]). It has been applied to the owners of underground water or percolating waters. (*Katz* v. *Walkinshaw,* 141 Cal. 116, 138 [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766].) It has been applied to riparian owners as between themselves (*Harris* v. *Harrison,* 93 Cal. 676, 681 [29 Pac. 325] ; *Southern Cal. Inv. Co.* v. *Wilshire,* 144 Cal. 68 [77 Pac. 767] ; *Turner* v. *James Canal Co.,* 155 Cal. 82, 95 [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520]). Since the declaration of this court that

the measure of reasonableness in the use of water did not apply as between a riparian proprietor and an appropriator, the state, through the Water Commission Act, has in my judgment brought the riparian owner within the rule of reasonable use. The legislature has the right in the first instance to prescribe the standards of beneficial use and reasonable necessity that may be applied to the use of water. If those standards be unreasonable in their entirety or in any given case they may be tested in a judicial proceeding by any party aggrieved, just as police regulations with reference to the ownership of other kinds of property may be tested. (*Village of Euclid* v. *Ambler Realty Co.* (U. S.), 47 Sup. Ct. Rep. 114 [71 L. Ed. Adv. Ops. 171].) The main opinion brushes aside sections 11 and 42 as an arbitrary usurpation of power by the state resulting in interference with and destruction of vested rights. The state of Oregon, by a similar legislative enactment, has limited the right of the riparian owner to the use of that quantity of water which is actually applied to a beneficial use, in the adoption of its "Water Code" in 1909. In upholding the validity of that provision of the act the supreme court of Oregon said: "No one has any property in the water itself, but a simple usufruct. It was within the province of the legislature by the act of 1909, to define a vested right of a riparian owner, or to establish a rule as to when and under what conditions and to what extent a vested right should be deemed to be created in a riparian proprietor." (*In re Hood River*, 114 Or. 112 [227 Pac. 1065, 1087].) The state of Washington also has restricted the riparian owner to reasonable use when in conflict with an appropriator. In the case of *Brown* v. *Chase*, 125 Wash. 542 [217 Pac. 23], the court said that where the supply of water in a stream is more than ample for all possible riparian uses, the presumption is that the diversion by a nonriparian user will not injure any riparian right.

In 1850 the legislature provided that the common law of England should be the rule of decision in all of the courts of this state in so far as it was not inconsistent with or repugnant to the state and federal constitutions and the laws of this state. (Stats. 1850, p. 219.) This provision was codified in 1872. (Pol. Code, sec. 4468.) One of the char-

acteristics of the common law is that it contains within itself its own repealer, that is to say, it changes as conditions change and adapts itself to new conditions, *ex proprio vigore.* It should be applied to our conditions when our conditions are similar to those out of which the common law arose, but when the common law is not applicable, because of different conditions, it should not be applied. (1 Kinney on Irrigation, secs. 509, 510; *Motl* v. *Boyd* (Tex.), 286 S. W. 458.) In *Lux* v. *Haggin,* 69 Cal. 255 [4 Pac. 919, 10 Pac. 674], the common-law doctrine of riparian rights was applied to water rights in this state. But the conditions prevailing over forty years ago when that case was decided were far different from conditions existing at the present time when the growth and prosperity of the state are so dependent upon the proper conservation of the excess waters of its rivers by storage for irrigation and power uses. That the common law, by its own principle, adapts itself to varying conditions and modifies its rules so as to subserve the ends of present requirements was recognized and decided in 1903 in the case of *Katz* v. *Walkinshaw, supra.* Rights to the use of real property, heretofore deemed vested, have been curtailed in the interest of the public welfare. It is axiomatic that all property is owned and possessed subject to reasonable regulations under the police power. There is nothing peculiar to a riparian right, which is part and parcel of land itself, that should exclude it from proper limitations in the interest of the people of the state. It is difficult to conceive of a question more intimately connected with the present and future industrial and economic development of the state than the conservation of the excess waters of its great rivers. The immediate question involved in this case is: How may the waters in excess of the reasonable requirements of the riparian owners be taken and put to a beneficial use? This question the state has endeavored to solve, at least in its initiatory stage, by the adoption of the Water Commission Act.

Citation of authority would seem to be unnecessary to support the proposition that no one may acquire a vested right to waste water in any form. That precise statement was made in the case of *Eden Irr. Co.* v. *District Court,* 61 Utah, 103 [211 Pac. 957], in the following language: "Let

it be remembered that no one can acquire a vested right to waste water in any form. In this arid country water is life and may not be wasted. In this connection it is of the utmost importance to remember that no one can acquire an absolute title to water as he can to other property. A person having absolute title to property generally may ordinarily waste it, destroy it, or permit it to go to decay and become utterly useless at his pleasure. This he may not do with water." Abundant authority to the same effect could be cited. The asserted right of a riparian owner in this state to have the waters of a river flow over or past his land regardless of the reasonableness of the use or the benefit that such use may be to him should therefore not be confirmed, especially when such use results in a needless waste and the deprivation of the rights of the state and of those who would use such waters for beneficial purposes under the authority of the state. The case of *Tulare Water Co.* v. *State Water Com.*, 187 Cal. 533 [202 Pac. 874], cited in the main opinion in support of the holding that sections 11 and 42 are void, did not purport to decide that the legislature was without power to safeguard the waters of the state from wastefulness and dissipation by the adoption of proper regulations. What that case did decide was that it was not competent for the legislature to confer upon the State Water Commission arbitrary power to refuse applications to appropriate waters in conformity with the provisions of the act. The power there sought to be exercised by the commission, as pointed out in the concurring opinion, was the exercise of a judicial function which it was not competent for the legislature to confer upon the commission. The sections of the act nullified by the main opinion do not attempt to confer judicial power on the commission. They merely declare the standards of beneficial use to be adhered to unless set aside when subjected to proper judicial test, and there is nothing in this case to indicate that those standards are unreasonable.

As to the particular facts in this case: The appellant is both a riparian owner and an appropriator on the upper reaches of the San Joaquin River. The plaintiffs are the owners of some 18,000 acres of land bordering on the river below. This tract is an uncultivated area of grazing land not devoted to cultivated crops. In the spring and early summer it is inundated by the waters of the river to such an

extent that as such waters flow down the valley they resemble a moving lake. During that season of the year the flow amounts to from 10,000 to 20,000 cubic feet of water per second. The court found that a constant flow of 180 cubic feet per second from April 1st to October 1st of each year would irrigate the lands of the plaintiffs if the same were prepared for *intensive cultivation.* "The amount of water sufficient to cover the ground two and one-half feet deep is generally considered plenty if beneficially used; therefore, one second foot should, it has been said, be sufficient to irrigate one hundred to two hundred acres." (Wiel on Water Rights, 3d ed., p. 522, citing *Hough* v. *Porter,* 51 Or. 318 [95 Pac. 732, 98 Pac. 1083, 102 Pac. 728].) The amount found by the court to be sufficient was, therefore, no more and, in fact, was less than the statute declares may be used for beneficial purposes. In the face of that finding and notwithstanding its admitted support in the evidence the opinion proceeds to declare said sections of the statute nugatory.

The plaintiffs do not pretend to use or to be able to use the great volume of water that flows by their land on to San Francisco Bay in the sense that the term "use of water" is ordinarily employed, namely, for the purpose of sinking into or moistening the soil of their lands. The use they demand is to employ this tremendous flow as a booster or a means of conveyance or of transportation to lift the very small percentage of the flow so useful to them to and over their pasture lands. A more extravagant or wasteful use of water could not well be imagined. Two and one-half acre-feet of water is more than annually sinks into their lands. The balance is excess as to them and so far as they are concerned passes on to the sea and is utterly wasted. This waste is not only contrary to the statutory regulation but it works an injustice to the state, which is endeavoring to conserve such waters for useful and beneficial uses by appropriators under the laws of the state.

The main opinion stresses the fact that the court found that the proposed use of the waters of the river by the appellant was and is unreasonable as against the plaintiffs and that the use by the plaintiffs of the entire flow of the river was necessary to the enjoyment of their riparian right,

and that therefore this court is bound by those findings. It may be conceded that the question of reasonableness is usually one of fact for the determination of the trial court, but it is also true that when the facts found in the light of the evidence disclose a use or a method of use of water that is so excessive and wasteful as to be palpably unreasonable, a question of law is then presented. (40 Cyc. 563.) The conclusion of the trial court that the storage plans and enterprise of the appellant will result in an unreasonable use of the waters of the river and the further conclusion that the natural flow of the river is necessary for the plaintiffs' purposes are predicated upon the continuance of the present status. Claim for the continuance of that status on the part of the plaintiffs is so unreasonable as to render their position inequitable and to justify the denial of the absolute injunction granted in this case. It would seem that the impounding of the waters by the appellant as proposed could only result in an equalization of the flow of the river with a constant release of sufficient water to develop the contiguous valley to a high state of cultivation and to the ultimate benefit of plaintiffs' lands. In fact, it has been said as to the overflow waters in this locality in the spring and early summer season that "at such times the San Joaquin river itself is carrying an abundance of water. The excess waters are not needed and are not used and are rather a detriment than a benefit to the land owners." (*Miller & Lux* v. *Enterprise etc. Co.,* 169 Cal. 415, 420 [147 Pac. 567, 569].)

If it be assumed that the plaintiffs would suffer detriment in being deprived of the use of such excess waters, wasteful though it be, and if it be assumed that it would not be necessary to reduce that detriment to *damnum absque injuria,* still the absolute injunction should not be granted. Such detriment would seem to be no more than the cost to the plaintiffs of conforming to a sane program of conservation by the construction of necessary diversion work. The court found that such preparation would entail a large expenditure of money, but it did not find the amount that would be required. The cause should at least be remanded for the purpose of ascertaining the amount of that expenditure. In other words, whatever present detriment might accrue to the plaintiffs by reason of being deprived of the lifting

200 Cal.—9

facilities afforded by the flow in excess of what they reasonably need should be ascertained. The fact that the appellant possesses the power of eminent domain is not a justification for the injunction as ordered. That the appellant has that right supports the view that the trial court in this proceeding and in the injunction order itself could adequately provide for compensation to the plaintiffs for the damage suffered, if any. In such a case when "the court can arrive in terms of money at the loss which plaintiff has sustained, an absolute injunction should not be granted, but an injunction conditional merely upon the failure of the defendant to make good the damage which results from its work. . . . The defendant in effect would be held to be damaging private property without just compensation first made to the owner, and, failing to make such compensation, should be enjoined from further damage. For, as was said by this court in *Montecito Valley* v. *Santa Barbara,* 144 Cal. 587 [77 Pac. 1113], in a case similar to this, 'a prohibitory injunction should only be granted if any and all other forms of relief should be found inadequate.'" (*Newport* v. *Temescal Water Co.,* 149 Cal. 531 [6 L. R. A. (N. S.) 1098, 87 Pac. 372].) In a condemnation proceeding the court could arrive in terms of money at the loss which the plaintiffs would sustain and no good reason appears why it may not do so in this proceeding.

I am of the opinion that sections 11 and 42 of the Water Commission Act constitute valid regulations in the interest of the conservation of the waters of the state; that as between a riparian owner and an appropriator of water the rule of reasonable use should apply to the one the same as to the other; that the Water Commission Act has properly established that rule and that this court should hold in harmony with the legislative declaration when such declaration, as here, appears to be just and reasonable in recognition of the vested riparian right; that the appellant as an appropriator of water has the right of storage and should have its reasonable exercise of that right balanced only against the reasonable exercise by the plaintiffs of their riparian right; that the plaintiffs should not be upheld in their insistence that the present wasteful use or method of use of waters of the river shall continue, and that in any event the method

of procedure suggested in *Newport* v. *Temescal Water Co.,* *supra,* at page 538, should be adopted, viz., that of requiring the trial court in the exercise of the equity power it possesses to find the damage, if any, suffered by the plaintiffs and under the prayer of the appellant for general relief make the "injunction conditional merely upon the failure of the defendant to make good the damage." In that way the extensive project undertaken by the appellant need not be stopped, the preference and other lawful rights of the plaintiffs would be protected, and the state be not impeded in working out its highly important task of conserving the waters of the state for this and coming generations. That such is the duty of the state can admit of no doubt. Its purpose to that end is commended and urged by the attorney-general of the United States, the attorney-general of California, the attorney for the state division of water rights, and counsel for numerous irrigation districts appearing as *amici curiae* herein. It seems to me that the appropriate opportunity to interpret the laws of the state in harmony with present day requirements as contemplated by the statute is presented in the case at bar.

Rehearing denied.

Shenk, J., Langdon, J., and Finch, J., *pro tem.,* voted for a rehearing.